## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| IN RE KBR, INC. SECURITIES LITIGATION | **Case No. 17-cv-1375**<br><br>**Hon. Ewing Werlein Jr.**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Lead Plaintiffs Kuberbhai M. Patel and Kanti K. Patel ("Lead Plaintiffs"), and named plaintiffs Barry Porter and Susan Denenberg (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against KBR, Inc. ("KBR" or the "Company"), Stuart J. Bradie, William P. Utt, Mark W. Sopp, Brian K. Ferraioli, Susan K. Carter, Jay Ibrahim, Jan Egil Braendeland, and Robert D. Zelinski ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding KBR, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired KBR securities between February 20, 2013 and April 27, 2017, both dates inclusive (the "Class Period"), seeking to

1

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      KBR provides professional services and technologies across the asset and program life-cycle within the government services and hydrocarbons industries worldwide. The company operates through three segments: Government Services, Technology & Consulting, and Engineering & Construction. The Company is based in Houston, Texas, and its common stock trades on the NYSE under the ticker symbol "KBR."

3.      KBR has a history of putting greed ahead of the law by making illegal payments to win business. Kellogg Brown & Root LLC ("KBR LLC"), KBR's wholly-owned subsidiary, participated in a 10-year scheme to bribe Nigerian officials to obtain contracts (the "Nigeria scandal").

4.      As a result of the Nigeria scandal: (i) in 2009, KBR, Halliburton Co. ("Halliburton"), KBR's former parent company, and KBR LLC agreed to pay millions of dollars in fines, KBR agreed to have an independent monitor review and report on the Company's compliance program for three-years, and KBR and Halliburton agreed to disgorge profits; (ii) in 2009, KBR LLC pled guilty to a five-count criminal information before the Hon. Keith Ellison of the Southern District of Texas to charges related to the Foreign Corrupt Practices Act ("FCPA"); (iii) in 2011, M.W. Kellogg Ltd., a United Kingdom ("U.K.") subsidiary of KBR, agreed to disgorge the money that was generated through the criminal activity of third parties, including KBR, under the Proceeds of Crime Act; and (iv) in 2012, KBR's Chief Executive Officer ("CEO") was sentenced to 2.5 years in prison.

5.      KBR is once again in the middle of a massive foreign bribes-for-contracts scandal in the oil industry involving Unaoil, a Monaco-based company.

6.      At the same time as the Nigeria scandal was occurring, KBR and certain of its controlled U.K. subsidiaries ("U.K. Subsidiaries") engaged in a bribery scheme with Unaoil. Unaoil was paid millions of dollars by KBR over many years, and in exchange, Unaoil agreed to secure lucrative contracts in Kazakhstan and Azerbaijan by bribing corrupt officials in those countries.  Unaoil and KBR tried to hide what they were doing by using code words in emails to refer to bribing corrupt officials.

7.      KBR was successful in getting what it wanted.  The Company and/or its U.K. Subsidiaries won contracts, and continue to win contracts, in Kazakhstan and Azerbaijan as a result of the bribery scheme.  To this day, KBR profits from the bribery scheme.

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; the commissions paid by KBR to Unaoil were used to effectuate such bribes; KBR earned revenue and profits from such contracts; and profits derived from such contracts were subject to disgorgement.

9.      On July 29, 2016, KBR filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016. The report stated: "The U.S. DOJ and the SEC are conducting investigations of news reports related to Unaoil … and activities Unaoil may have engaged in related to international projects

3

involving several global companies, including KBR. We have been, and intend to continue, cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

10.     On this news, KBR's share price fell $0.60, or 4.1%, to close at $14.02 on July 29, 2016.

11.     On November 1, 2016, KBR filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016.   The report stated (emphasis added): "The U.S. DOJ and the SEC are conducting investigations of activities Unaoil … may have engaged in related to international projects involving several global companies, *as well as KBR's interactions with Unaoil*.   KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

12.     On this news, KBR's share price fell $0.24, or approximately 2%, to close at $14.57 on November 1, 2016.

13.     On January 17, 2017, Rolls-Royce admitted to paying Unaoil to bribe people on its behalf to secure contracts in Azerbaijan, Kazakhstan, Iraq, Angola and elsewhere, pursuant to a deal with U.S. and British authorities.  The company will pay $800 million in connection with the bribery scandal.  Of the $800 million settlement, Rolls-Royce will pay about $170 million to the U.S. Treasury, about $600 million to the U.K.'s Serious Fraud Office ("SFO"), and $25 million to the Brazilian Ministério Publico Federal.

14.   On this news, KBR's share price fell $0.18, or 1%, to close at $16.66 on January 18, 2017.

15.   On April 28, 2017, the SFO confirmed that it had opened an investigation into "the activities of KBR's UK subsidiaries, their officers, employees and agents for suspected offences of bribery and corruption…   The investigation is related to the SFO's ongoing investigation into the activities of Unaoil."

16.   Additionally, on April 28, 2017, KBR filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2017.   KBR put its own spin on the SFO investigation.   The report stated (emphasis added):

> The DOJ, SEC, and the SFO are conducting investigations of Unaoil … in relation to international projects involving several global companies, including KBR, whose interactions with Unaoil are a subject of those investigations.   KBR is cooperating with the DOJ, SEC, and the SFO in their investigations, which includes the voluntary submission of information and compliance with formal document requests, including a subpoena from the SEC and a Section 2 notice from the SFO.
>
> ***
>
> As has been reported previously, following our 2009 guilty plea and settlement with the DOJ and SEC over the legacy TSKJ [Nigerian] matter[,] KBR was under a DOJ-approved monitorship during which our compliance program was significantly enhanced and now is extremely robust. We conducted a thorough review of all international business relationships at the time of the monitorship *and only continued with those parties, including Unaoil*, that passed our rigorous review and agreed to adhere to all applicable anti-corruption laws.

17.   On this news, KBR's share price fell $1.43, or 9.24%, to close at $14.05 on April 28, 2017.

18.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant KBR is headquartered in this district and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23.     Lead Plaintiff Kuberbhai M. Patel acquired KBR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     Lead Plaintiff Kanti K. Patel acquired KBR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Plaintiff Barry Porter acquired KBR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26.     Plaintiff Susan Denenberg acquired KBR securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.     Defendant KBR is incorporated in Delaware, and the Company's principal executive offices are located at 601 Jefferson Street, Suite 3400, Houston, Texas 77002. KBR's common stock trades on the NYSE under the ticker symbol "KBR."

28.     Defendant Stuart J. Bradie ("Bradie") serves as the Company's CEO, President, and Director since June 2014.

29.     Defendant William P. Utt ("Utt") served as the Company's CEO and President from March 2006 to June 2014. He also served as a Director from 2007-2014.

30.     Defendant Mark W. Sopp ("Sopp") serves as the Company's Chief Financial Officer ("CFO") and Executive Vice President since February 2017.

31.     Defendant Brian K. Ferraioli ("Ferraioli") served as the Company's CFO and Executive Vice President from October 2013 to February 2017.

32.     Defendant Susan K. Carter ("Carter") served as the Company's CFO and Executive Vice President from October 2009 to September 2013.

33.     Defendant Jay Ibrahim serves as KBR's President, Engineering and Construction ("E&C") Europe, Middle East and Africa ("EMEA") since May 2015.

34.     Defendant Jan Egil Braendeland serves as KBR's Executive Vice President, Global Sales since mid-2016, and previously served as KBR's President, E&C Europe, Eurasia & Africa since 2015. Before that, he served as President, Oil & Gas after rejoining KBR in July 2013. He also serves as a Director of SOCAR KBR LLC since 2015.

35.     Defendant Robert D. Zelinski serves as KBR's President – Onshore for E&C Americas since 2016.  Previously, he served as KBR's President, Downstream Business Unit since May 2012.

36.     The Defendants referenced above in ¶¶ 28-35 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37.     Kellogg, Brown & Root, Inc. was created in 1998 when M.W. Kellogg Company merged with Brown & Root Engineering and Construction.  It later became KBR, a publicly traded company, that was incorporated on March 21, 2006 prior to an exchange offer transaction that separated KBR from its former parent, Halliburton, which was completed on April 5, 2007. KBR was a wholly-owned subsidiary of Halliburton prior to the transaction.  (References to KBR include its predecessor entity, Kellogg, Brown & Root, Inc.)

38.     KBR provides professional services and technologies across the asset and program life-cycle within the government services and hydrocarbons industries worldwide. In 2014, the Company streamlined operations to focus on three business segments: Government Services, Technology & Consulting, and Engineering & Construction.

39.     KBR builds infrastructure for the U.S. government and energy facilities, like gas and drilling plants, and operates in the Middle East, Europe, Africa and North America.

40.     KBR and its U.K. Subsidiaries have offices in the U.K.  During the Class Period, KBR directed the day-to-day operations of its U.K. Subsidiaries.  KBR and its U.K. Subsidiaries operate global businesses in Kazakhstan and Azerbaijan that are managed out of the U.K.

8

**The Foreign Corrupt Practices Act of 1977**

41.     Congress enacted the FCPA, 15 U.S.C. §§ 78dd-1, *et seq*. (1998), to prohibit bribery and corruption of foreign officials and to promote fair business practices, integrity, and accountability in companies operating on a global stage.  Specifically, the FCPA's anti-bribery provision makes it a crime to "corruptly" offer any kind of payment to a foreign official "in order to assist . . . in obtaining or retaining business."  15 U.S.C. § 78dd-2.

42.     The FCPA also requires companies whose securities are listed in the U.S. to adhere to its accounting provisions.  The "books and records" provision requires a company to "make and keep books, records, and accounts . . . in reasonable detail [] to reflect accurately and fairly transactions and dispositions of [] assets, and to devise and maintain system of internal accounting controls . . ."  15 U.S.C. § 78m(b)(2); 15 U.S.C. § 78m(b)(5).

**The Nigeria Scandal**

43.     The SFO's current investigation is not KBR's first run-in with corruption.  On February 11, 2009, the SEC announced settlements with KBR and Halliburton to resolve charges that KBR's wholly-owned subsidiary, KBR LLC, bribed Nigerian government officials over a 10-year period to obtain construction contracts in violation of the FCPA.  The SEC also charged that KBR and Halliburton engaged in books and records violations and internal control violations related to the bribery.  According to a February 11, 2009 Litigation Release,

> KBR and Halliburton have agreed to pay $177 million in disgorgement to settle the SEC's charges.  [KBR LLC] has agreed to pay a $402 million fine to settle parallel criminal charges brought today by the U.S. Department of Justice.  The sanctions represent the largest combined settlement ever paid by U.S. companies since the FCPA's inception.
>
> [KBR LLC's] predecessor entities (Kellogg, Brown & Root, Inc. and The M.W. Kellogg Company) were members of a four-company joint venture that won the construction contracts worth more than $6 billion….

The SEC alleges that beginning as early as 1994, members of the joint venture determined that it was necessary to pay bribes to officials within the Nigerian government in order to obtain the construction contracts.  The former CEO of the predecessor entities, Albert "Jack" Stanley, and others involved in the joint venture met with high-ranking Nigerian government officials and their representatives on at least four occasions to arrange the bribe payments.  To conceal the illicit payments, the joint venture entered into sham contracts with two agents, one based in the United Kingdom and one based in Japan, to funnel money to Nigerian officials.

*** 

The SEC's complaint alleges that the internal controls of Halliburton, the parent company of the KBR predecessor entities from 1998 to 2006, failed to detect or prevent the bribery, and that Halliburton records were falsified as a result of the bribery scheme.  In September 2008, Stanley pleaded guilty to bribery and related charges and entered into a settlement with the SEC.

The SEC alleges that officials of the joint venture formed a "cultural committee" to decide how to carry out the bribery scheme.  The committee decided to use the United Kingdom agent to make payments to high-ranking officials and to use the Japanese agent to make payments to low-ranking Nigerian officials.  As the joint venture was paid for work on the construction project, the joint venture in turn made payments to the Japanese agent and to the Swiss and Monaco bank accounts of the United Kingdom agent.  The total payments to the two agents exceeded $180 million.  After receiving the money, the United Kingdom agent made substantial payments to accounts controlled by Nigerian government officials, and beginning in 2002 paid $5 million in cash to a Nigerian political party.

*** 

Without admitting or denying the SEC's allegation, KBR and Halliburton have consented to the entry of a court order that (i) permanently enjoins KBR from violating the anti-bribery and records falsification provisions in Section 30A, 13(b)(5) and Rule 13b2-1 of the Securities Exchange Act of 1934, and from aiding and abetting violations of the record-keeping and internal control provisions in Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; … (iii) orders the companies to disgorge $177 million in ill-gotten profits derived from the scheme; (iv) imposes an independent monitor for KBR for a period of three years to review its FCPA compliance program….

44.      The settlement still ranks the third biggest FCPA enforcement action ever.

45.      KBR LLC pled guilty on February 11, 2009 to a five-count criminal information before the Hon. Keith Ellison of the Southern District of Texas to charges related to the FCPA for its participation in the decade-long scheme to bribe Nigerian government officials.

10

46.     In 2012, Stanley was sentenced to 2.5 years in prison and three years of probation for his role in the bribery scheme.

47.     M.W. Kellogg Ltd. ("MWKL"), a U.K. subsidiary of KBR, reached an $11.2 million settlement in a suit brought by British regulators on February 16, 2011 over profits received from the bribery scheme.  The SFO stated that MWKL agreed to an order in the High Court to repay money that was generated through the criminal activity of third parties, including KBR, under the Proceeds of Crime Act.

48.     The SFO stated that the Nigerian contracts were awarded to a special purpose vehicle partly owned by MWKL on behalf of KBR.  MWKL voluntarily reported its concerns about profit it was due to receive, and the SFO and DOJ investigators decided to remove only the reported profit.

49.     In its plea agreement with the DOJ, KBR LLC acknowledged that it owned the special purpose vehicle created for the Nigeria project through MWKL to distance itself from the corruption and avoid the consequences of the FCPA.

50.     A confidential witness who worked with Stanley as Executive Project Manager on the Nigeria project from 2003 to 2008 to build liquified natural gas facilities on Bonny Island, Nigeria stated that having a "government monitor" sitting in the Houston office for a number of years was a "serious matter" and "[i]t was … pretty clear that we not do this again."

51.     In light of the serious consequences of the Nigeria scandal, as well as the fact that KBR was permanently enjoined from violating the anti-bribery and records falsification provisions in Section 30A, 13(b)(5) and Rule 13b2-1 of the Exchange Act, it is highly unlikely that Defendants would not have apprised themselves of the illicit activities in Kazakhstan and Azerbaijan.

**Unaoil Scandal**

52.     Once again, KBR finds itself in the middle of a massive foreign bribes-for-contracts scandal in the oil industry involving Unaoil, a Monaco-based company.

53.     In March 2016, The Age, an Australian newspaper, published a multi-part exposé based largely on the contents of Unaoil's hard drive which contained emails, records, and receipts, and showed that the founding family, the Ahsanis, and Unaoil's employees spoke in code words and nicknames to facilitate a brazen and widespread bribery scheme.  The Age also received hundreds of thousands of leaked documents from an anonymous source and shared them with its media partner, The Huffington Post, which published its own series of articles the same day as The Age.

54.     The SFO started investigating Unaoil in March 2016.  The day after the articles were published, the SFO, alongside with Monaco authorities, conducted a series of dawn raids and arrests of Ata Ahsani and his sons Cyrus and Saman.  The prosecutor did not publicly announce the probe until July 2016.

55.     In 2016, SFO investigators stated in court documents that they are "unconvinced that Unaoil conducts any lawful business."  As part of the Unaoil probe, the British authorities began investigations into various multinational companies that were former clients of Unaoil.

56.     Many international corporations relied on Unaoil to secure lucrative contracts in Kazakhstan, Azerbaijan, Libya, Syria, Iraq, Tunisia, and other countries in the former Soviet Union, Middle East and Africa.  While it is fairly common for large companies to partner with smaller companies with local expertise to win contracts from state-owned oil corporations, Unaoil was winning contracts on behalf of their clients by paying millions of dollars in bribes to corrupt officials.  Unaoil emails reveal the company's playbook.  Unaoil would ease foreign

officials into corruption by providing them with shopping sprees and small gifts.  Eventually, foreign officials were hooked on major graft.

57.     Unaoil's practice was to ask its clients for three per cent or more of the total value of the contract that it helped win, which KBR and others were happy to pay.  Unaoil would then use a portion of its percentage to bribe government officials or politicians and keep the remainder for itself.  Other clients included Petrofac, Rolls-Royce, Weatherford, SBM Offshore, Keppel, National Oilwell Varco, and Samsung.

### Kazakhstan

58.     Kazakhstan is a country where corruption is rampant.    Transparency International's Corruption Prevention Index for 2016, an annual measure of the perceived levels of public sector corruption worldwide based on expert opinion, ranks Kazakhstan with a "highly corrupt" score at 131 out of 176 countries analyzed.  As early as 2004, Transparency International ranked Kazakhstan as "highly corrupt" at 122 of 145 countries surveyed, placing it among other "oil-rich" countries where "[c]orruption robs [] their potential."

59.     Discovered in 2000, the Kashagan Field in Kazakhstan is one of the largest oil reserves found in decades and is managed by Kazakhstan's President, Nursultan Nazarbayev ("Nazarbayev"), with the help of some international energy giants.  Haliburton had tried for years to secure government contracts in Kazakhstan, to no avail.

60.     KBR and/or its U.K. Subsidiaries hired Unaoil and paid the company millions of dollars beginning at least as early as 2004 to help it secure lucrative oil and gas government contracts in Kazakhstan through bribery.  This occurred at the same time as the Nigeria scandal.

61.     At the time, Unaoil listed a London address on its contract with KBR, but requested payment from KBR though a wire transfer to Monaco.  During the DOJ's Nigeria

investigation, KBR ceased payment practices that could draw attention to itself.  A confidential witness who worked at one of KBR's U.K. Subsidiaries from August 1976 to December 2005 and was the finance manager responsible for administering the contract with Unaoil concerning the Kashagan Field project, confirmed that he sent an email to Unaoil Executive Vice President Peter Willimont ("Willimont") to discuss KBR's "Nigerian agent problem" and warn that KBR was "tightening" controls in response to the federal probe.  The email stated (emphasis added): "A part of the fall-out from [the DOJ Nigeria investigation] is a considerable tightening of our *US management's approach to controlling the whole arena of agent payments*."  The confidential witness explained that sending payment to Monaco, a country not listed on the contract, could violate FCPA rules.

62.     Although KBR discontinued payment practices that could raise red flags with investigators, it did not sever the relationship with Unaoil and continued to pay Unaoil for work in Kazakhstan and Azerbaijan for many years thereafter.

63.     Unaoil and KBR/Halliburton employees tried to hide what they were doing by using code words in emails to refer to bribing corrupt officials and others in Kazakhstan.

64.     Leaked emails sent to Cyrus Ahsani, the CEO of Unaoil, reveal that KBR and Halliburton knew, or were reckless in not knowing, that Unaoil was acting corruptly to win contracts in Kazakhstan.

65.     One particular senior manager from KBR clearly knew, and was pushing Unaoil hard to win favor.  Richard Stuckey ("Stuckey"), a KBR senior manager, emailed Unaoil executive Willimont from a Halliburton email address on February 23, 2005 urging him to start "hobknobbing [sic] with insiders immediately."  But the hobnobbing that KBR was seeking was far different than ordinary lobbying.

66.     Stuckey wrote: "my feeling is that a good spaghetti house is where it is at of course a little shashlik for lunch is good to digest also…"   "A good spaghetti house" was a reference to Eni, an Italian oil company that was leading the development of the Kashagan field pursuant to a 2001 agreement between the international energy giants and Kazakhstan's state-owned oil company, and overseeing the contracts KBR wanted to win.   "Shashlik" was a reference to the Kazakh government.

67.     KBR knew that Unaoil was bribing both Kazakh officials and Eni managers. Unaoil's leaked emails reveal that Unaoil executives were trying to persuade KBR/Halliburton managers that they could obtain confidential information from paid sources within the Kazakhstan government and Eni.

68.     After forwarding Stuckey's February 23, 2005 email to Cyrus Ahsani that same day, Willimont wrote: "We need to convince Richard [Stuckey] that we own the Spaghetti House & have a lease on the Shashlik takeaway, this done we can get our deal signed."   Cyrus Ahsani responded the same day, also in code, that KBR should guarantee to give Unaoil a large commission before it began helping KBR.  He stated: "I will definitely work on this next week, but try to get the paper before we do the rounds.  It would help if we had it."

69.     In February 2008, Unaoil employees determined that the company needed a new bank account in Kazakhstan to receive payments from KBR.  In February 2008, Sandy Young, Unaoil's finance manager, wrote to a Unaoil colleague: "We need to open a new Bank Account … in Kazakhstan into which our future KBR revenues will flow."   "More and more our principals are asking to have the right to audit our companies as part of their governance rules and it is much easier for us to comply with this request if we use a separate bank account (this way we can limit the access we give them to information about our company activity)."

70.     By 2008, KBR pledged over $10 million in commissions to Unaoil, and in January 2009, KBR paid $936,713 to Unaoil's new account in Kazakhstan, according to a bank account transfer record included in one of the leaked emails.  (A few weeks after the January 2009 payment, KBR LLC pled guilty to FCPA-related charges and agreed to pay a $402 million criminal fine for its participation in the decade-long scheme to bribe Nigerian government officials to obtain contracts.)

71.     In a June 2008 email to Cyrus Ahsani, Willimont wrote: "Our ability to live from the reputation of working with KBR is immense."

72.     Throughout 2008, Unaoil spent enormous sums of money on lavish hotel rooms for Kazakhstan officials visiting Monaco, including Kairat Boranbayev who, at the time, was the Chairman of Kazakhstan oil company's joint venture with Gazprom, Russia's state-owned gas monopoly.  Unaoil paid the money to curry favor with Kazakhstan officials for purposes of its relationship with its American client, KBR.

73.     Unaoil also assisted Kazakh officials with a fraudulent visa request to the Spanish embassy, and even assisted a front man for an influential Kazakh figure to set up a British Virgin Islands company and a bank account in Bermuda.

74.     Unaoil attempted to win a joint contract for KBR and British oil company Petrofac in 2004 to work on the Kashagan oil field.  To do so, Unaoil bribed Leonida Bortolazzo ("Bortolazzo"), an Eni executive.  Leaked emails show that Unaoil paid tens of thousands of dollars to purchase high-end furniture for Bortolazzo's London home while he was overseeing large Kazakh oil service contracts in 2004.  Unaoil would continue to bribe Bortolazzo for years to come.

75.     According to a KBR/Halliburton employee's memo, the Kazakh Institute of Oil and Gas ("KING"), a wing of Kazakhstan's state-owned oil company, was paying Bortolazzo as a consultant after he left Eni in October 2004.   The memo also bragged about Bortolazzo's influence in Kazakhstan.   Unaoil also paid Bortolazzo a $165,000 signing bonus and as much as $80,000 a month, as stated in a contract between Bortolazzo's consulting company and Unaoil, in return for corrupting tender committees to favor KBR and other Unaoil clients.   One Unaoil email stated that it promised Bortolazzo $2.5 million to aid with driving business to KBR and others.   Unaoil paid Bortolazzo to bribe corrupt friends inside Eni.

76.     Leaked documents also show that Unaoil sought to corrupt senior Eni manager Diego Braghi ("Braghi") to give Unaoil clients an advantage over other companies.   In one email, Braghi stated that in return for kickbacks, he "can provide all the tender details, clarifications, evaluations" from the tender committee he was appointed to oversee and keep confidential.

77.     Five Italian middlemen, including several operating out of London, were used by Unaoil to bribe a number of Eni executives.   Bortolazzo was the most powerful.   Unaoil's leaked emails disclose that there was rampant corruption inside Eni in many of the countries in which the firm had been contracted by national governments to manage oilfields.   Eni executives leaked highly sensitive information and rigged contracts to support KBR.

78.     Leaked documents also show that Unaoil sought to corrupt Kazakh senior official Serik Burkitbayev ("Burkitbayev"), a former adviser to President Nazarbayev and former head of KazMunayGas, the Kazakhstan operator for exploration, production, refining and transportation of hydrocarbons representing the state interests in the oil and gas industry in Kazakhstan, to give KBR and other Unaoil clients an advantage over other companies.

17

Burkitbayev was running KING and was good friends with Bortolazzo, with whom he worked closely.  Burkitbayev was later jailed for corruption.

79.     KBR was desperately seeking to secure the support of KING, Burkitbayev, and Bortolazzo because they had, as stated in a leaked 2005 KBR memo: "unofficial preferential treatment when tendering … instant access to decision makers in the Kazakh Government and … access to information simply not available to the likes of KBR."  At the time of this KBR memo, Unaoil was already bribing Bortolazzo.

80.     KBR and Unaoil were also desperately seeking the backing of billionaire Timur Kulibayev, the son-in-law of President Nazarbayev, who exercised a great deal of control over Kazakhstan's oil industry.  Information from leaked emails show that Unaoil and its clients sought to win his favor by engaging in business deals with companies he controlled.

81.     As a direct result of paying millions of dollars to Unaoil over the course of many years to win contracts on its behalf in Kazakhstan through bribery, KBR (and/or its U.K. Subsidiaries) were awarded contracts worth hundreds of millions of dollars in Kazakhstan.  For example, KBR announced on March 1, 2017 that it was awarded a two-year engineering services call off-contract by the North Caspian Operating Company ("NCOC") for its projects in the Kazakhstan zone of the Caspian Sea.

82.     Under the North Caspian Sea Production Sharing Agreement ("NCSPSA"), NCOC acts on behalf of a consortium of seven energy companies comprised of KazMunayGas, Eni, Shell, ExxonMobil, Total, CNCP and INPEX, to operate oil and gas activities within the offshore oil field developments covered under the NCSPSA including the Kashagan, Akote, Kairan and Kalamkas fields.  The Kahagan, Akote, Kairan, and Kalamkas fields are all in Kazakhstan.

83.     Jay Ibrahim, KBR's President for E&C EMEA, stated on March 1, 2017: "KBR is pleased to have the opportunity to provide our renowned front-end expertise, and engineering and execution excellence, for these significant projects for NCOC."  "This award continues KBR's long time work in the Caspian region and our enduring relationship with the operators on these off-shore developments to deliver economic and innovative solutions to further the development of these challenging projects…."

84.     The Company further stated: "KBR has extensive operations and experience in the Caspian region with offices and local employees and wide-ranging project expertise, from feasibility studies and conceptual designs to the provision of extensive project management services for various clients in the region."

**Azerbaijan**

85.     Azerbaijan is also a country where corruption is rampant.  Transparency International's Corruption Prevention Index for 2016 ranked Azerbaijan with a low score at 123 out of 176 countries analyzed.  Similarly to Kazakhstan, Transparency International ranked Azerbaijan in 2004 as "highly corrupt" at 140 of 145 countries surveyed, placing it among other "oil-rich" countries marked by corruption.  Transparency International in 2015 published a special report on the "endemic and deeply institutionalised" corruption in Azerbaijan and several other neighboring countries, noting that "numerous [Azeri] senior politicians maintain strong connections to the business sector."

86.     KBR and/or its U.K. Subsidiaries also hired Unaoil, and paid the company millions of dollars, to help win government contracts in neighboring Azerbaijan through bribery.

87.     Unaoil's Managing Director in Azerbaijan, Mohammad Reza Raein ("Raein"), acted as an oil industry middleman in Azerbaijan on behalf of Unaoil.  A leaked 1999 KBR

document stated that Unaoil's middleman in the country, Raein, was "very close to the President, [IIham Aliyev,] and his family … [and] ha[s] an access to every office in the country."  He also had ties to Azerbaijan Energy Minister Natik Aliyev.

88.     Raein received millions of dollars from Unaoil spread across multiple bank accounts in return for highly confidential information from senior Azeri government officials, which Unaoil shared with KBR and its other multinational clients.

89.     One of those officials was Valeh Aleskerov ("Aleskerov"), an official with the State Oil Company of Azerbaijan Republic ("SOCAR"), and deputy speaker of Azerbaijan's parliament and chair of its committee on ecology and natural resources.  SOCAR is one of the world's largest oil-gas companies.   At SOCAR, Aleskerov was responsible for handling Azerbaijan's dealings with foreign investors.   The other two government sources leaking information to KBR through Unaoil are believed to be senior officials in SOCAR, most likely vice presidents.   Leaked documents show that Raein obtained confidential government information from men whose identity Raein and Unaoil referred to by code names.

90.     Leaked emails disclose that Raein was paid $4.5 million for his work in Azerbaijan between 1996 and 2005 plus expenses.  Raein repeatedly asked Unaoil to deposit tens of thousands of dollars in different bank accounts, including some that were not his.  At times, he asked for money to go to a fashion house or for amounts of up to $50,000 to be wired to his American Express card account.

91.     Information from leaked emails show that in 2005, Raein had a man named Javad make a payment on behalf of Unaoil and him.  Months later, Raein twice asked for Unaoil to wire a total of $50,000 into two of Javad's bank accounts.  Javad was well-connected since a

20

close relative of Javad's wife was a senior SOCAR official.  Raein made clear that Unaoil could approach the senior SOCAR official at any time it wanted.

92.     As a direct result of paying Unaoil millions of dollars over the course of many years to win contracts on its behalf in Azerbaijan through bribery, KBR (and/or its U.K. Subsidiaries) were awarded contracts worth hundreds of millions of dollars in Azerbaijan.

93.     For example, on or about March 23, 2009, KBR was awarded a contract by BP on behalf of the Azerbaijan International Oil Company ("AIOC") to provide front-end engineering and design ("FEED") services for the Chirag Oil Project located in the Azerbaijan sector of the Caspian Sea.  The AIOC is a consortium composed of SOCAR and a number of international oil companies such as BP, Chevron, ExxonMobil, Statoil, Hess and others.  KBR provided FEED and procurement support services for six offshore platforms, subsea facilities, 600 kilometers of offshore pipeline and onshore terminal upgrades in connection with the Azeri-Chirag-Gunashi oil field development.

94.     On August 15, 2012, the Azeri state news agency Azer Tac reported than on August 14, 2012, SOCAR President Rovnag Abdullayev met with a KBR delegation in Baku including Roy Oelking, Group President of Hydrocarbons of KBR, Inc.  Oelking stated, "[w]e are proud of our participation in the oil and gas operations of Azerbaijan in recent years and our contributions to these achievements."

95.     On March 7, 2013, KBR announced that it was awarded a contract by SOCAR to provide project management consultancy ("PMC") services for the FEED phase of the Gas Processing Plant within the new Oil-Gas Processing and Petrochemical Complex ("OGPC") in Azerbaijan.  KBR said that this award was "the first direct engagement between SOCAR and KBR on a large world-scale capital project."  The press release further stated:

The OGPC will consist of a gas processing plant, currently in FEED phase, with throughput capacity of 10-12 billion cubic meters per annum and a refinery plant with a capacity of 10 million tonnes per annum. Oil products are being developed as strategic domestic assets and the petrochemical plant is being developed mostly for the export market. The GPP FEED completion is expected circa October 2013, with the overall OGPC expected to begin operating in late 2020.

96.     Additionally, on March 27, 2015, KBR announced that it signed a joint venture agreement with SOCAR to establish a new engineering and support services company in Azerbaijan.  "With support from KBR and SOCAR, the new company will provide design, engineering, technical procurement, construction supervision and project management service for projects across the upstream, midstream and downstream oil and gas sectors, primarily in the Republic of Azerbaijan….  Additionally, it will train and develop the local workforce and supervise contractors throughout all stages of a project…."

97.     On March 8, 2016, KBR announced that its joint venture with SOCAR was awarded a significant PMC for the Heydar Aliyev Baku oil refinery modernization project in Azerbaijan.  KBR's press release stated: "This award marks the first major award to the joint venture, SOCAR-KBR Limited Liability Company (SOCAR-KBR LLC), since its inception in mid-2015."  "The value of the PMC contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in Q1 of 2016."

98.     On November 7, 2016, KBR announced that its joint venture with SOCAR was awarded a second program management consultancy contract for the Azerikimya Production Union of the State Oil Company of Azerbaijan.  "The value of the contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in Q4 of 2016."

**Materially False and Misleading Statements Issued During the Class Period**

**Fiscal Year 2012, Q4 and Annual**

99.      The Class Period begins on February 20, 2013, when KBR filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").   For the quarter, KBR reported net income of $30 million, or $0.20 per diluted share, on revenue of $1.87 billion, compared to net income of $90 million, or $0.60 per diluted share, on revenue of $2.1 billion for the same period in the prior year.   For fiscal year 2012, KBR reported net income of $144 million, or $0.97 per diluted share, on revenue of $7.92 billion, compared to net income of $480 million, or $3.16 per diluted share, on revenue of $ 9.26 billion for fiscal year 2011.

100.      In the 2012 10-K, the Company stated, in relevant part:

**Compliance**

We are subject to numerous compliance-related laws and regulations, including the Foreign Corrupt Practices Act, the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Conducting our business with ethics and integrity is a key priority for KBR. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct.

101.      The Company's Code of Business Conduct, published at all relevant times on KBR's website, addresses KBR's policies regarding bribery and corruption in further detail, stating in relevant part:

**BRIBERY AND CORRUPTION**

Employees and third parties acting on KBR's behalf are prohibited from making, offering, authorizing or promising to make any Improper Payments. The term "Improper Payments" is used to describe a broad range of unlawful payments of

23

money or anything of value that are usually in the nature of kickbacks, bribes or payoffs made in order to influence favorably some decision affecting a company's business or for the personal gain of an individual. These types of payments are illegal, unethical and prohibited by this Code of Business Conduct.

The Company prohibits all Employees and third parties acting on KBR's behalf from paying, offering, promising or authorizing any bribe, kickback or other similar unlawful payment of money or anything of value to any public official, government employee, political party or party official, candidate for public office, or employee of a public international organization in any country.

All transactions must be executed, and access to assets is permitted, only in accordance with management's authorization.

Employees are also prohibited from receiving, directly or indirectly, from a third party any Improper Payments or anything of significant value in connection with a transaction entered into by the Company.

The Company, its Employees and third parties acting on its behalf are prohibited from making any "facilitating" or expediting payments to any government official or employee, the purpose of which is to expedite or to secure the performance of non-discretionary routine governmental action by such official.

In very rare circumstances, an Employee may deem it necessary to make a payment to a government official or employee to avoid an imminent threat to personal health, safety or freedom in a situation where the Employee is unable to obtain the necessary prior approval given the situation. If a payment is made under these circumstances, as soon as possible, the Employee who made the payment must contact the Director of Compliance or his or her delegate for further direction.

Because actions of third parties acting on behalf of KBR, like actions of Employees, can create liability for the company and damage its reputation, all third parties who may interact with non-U.S. government officials or employees on behalf of the Company and other designated high-risk third parties shall be:

(i)      Subject to appropriate risk-based due diligence prior to being engaged;

(ii)     Prohibited from making Improper Payments; and

(iii)    Subject to additional anti-corruption terms and conditions as appropriate.

Depending on the circumstances, donations to charitable organizations or community organizations could be considered to be Improper Payments.

The Procedures for Implementation of KBR's Anti-Corruption Policies provide further guidance on the processes required to engage third parties and make donations.

102.   The 2012 10-K also stated (emphasis added):

*Oil & Gas.*  Oil & Gas revenue decreased by $5 million and job income increased by $11 million in 2012 compared to 2011. The decrease in revenue is primarily due to the completion or near-completion of several long term projects in late 2011 and during 2012. *These project completions were offset by other long term technical service projects and increased progress on existing projects primarily located in the North Sea and Azerbaijan*, as well as the recognition of $8 million in license fee revenue for several semi-submersible hulls. *The increase in job income is primarily due to increased progress for projects in the North Sea and Azerbaijan*, as well as the recognition of the license fees, partially offset by the completion or near completion of other projects.

***

***Foreign Corrupt Practices Act ("FCPA") investigations***

In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division (the "Court"), related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty of $402 million, of which Halliburton was obligated to pay $382 million under the terms of the Master Separation Agreement ("MSA"), while we were obligated to pay $20 million.  In addition, we settled a civil enforcement action by the SEC which called for Halliburton and KBR, jointly and severally, to make payments totaling $177 million, which was paid by Halliburton pursuant to the indemnification under the MSA.  We also agreed to a period of organizational probation, during which we retained a monitor who assessed our compliance with the plea agreement and evaluated our FCPA compliance program over a three year period that ended on February 17, 2012. At the end of the three year period the monitor certified that KBR's current anti-corruption compliance program is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws.

In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty of approximately $11 million including interest and reimbursement of certain costs of the investigation, which was paid during the first quarter of 2011.  The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project. Due to the indemnity from Halliburton under the MSA, we received approximately $6 million from Halliburton in the second quarter of 2011.

With the settlement of the DOJ, SEC, SFO and other investigations, all known investigations in the Bonny Island project have been concluded. We are not aware of any

other corruption allegations against us by governmental authorities in foreign jurisdictions.

103.    The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Utt and Carter, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

104.    The statements made by Defendants in ¶¶ 99-103 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the "increase in job income" on projects in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2013, Q1**

105.    On April 25, 2013, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q").   For the quarter, KBR reported net income of $88 million, or $0.59 per diluted share, on revenue of $1.86 billion, compared to net income of $91 million, or $0.61 per diluted share, on revenue of $2 billion for the same period in the prior year.

106.    The Q1 2013 10-Q stated, in relevant part (emphasis added):

### Foreign Corrupt Practices Act ("FCPA") investigations

In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division (the "Court"), related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty of $402 million, of which Halliburton was obligated to pay $382 million under the terms of the Master Separation Agreement ("MSA"), while we were obligated to pay $20 million. In addition, we settled a civil enforcement action by the SEC which called for Halliburton and KBR, jointly and severally, to make payments totaling $177 million, which was paid by Halliburton pursuant to the indemnification under the MSA. We also agreed to a period of organizational probation, during which we retained a monitor who assessed our compliance with the plea agreement and evaluated our FCPA compliance program over a three year period that ended on February 17, 2012. At the end of the three year period the monitor certified that KBR's current anti-corruption compliance program is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws.

In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty of approximately $11 million including interest and reimbursement of certain costs of the investigation, which was paid during the first quarter of 2011. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project. Due to the indemnity from Halliburton under the MSA, we received approximately $6 million from Halliburton in the second quarter of 2011.

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working with the ADBG to resolve the issue. At this time because we only recently received the letter from the ADBG and are still in the process of evaluating the matter, it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investigation.

***

*Oil & Gas.* Oil & Gas revenue decreased by $10 million and job income increased by $2 million in the first quarter of 2013 compared to the same period of the prior year. The decrease in revenue is primarily due to the completion or near-completion of several long term projects including a project in the North Sea. *The impact from these project completions was offset by new projects awarded, as well as other long term*

*technical service projects and increased progress on existing projects including a project in Azerbaijan.  The increase in job income is primarily due to increased progress on new awards and for a project in Azerbaijan*, partially offset by the completion or near completion of other projects.

107.    The Q1 2013 10-Q contained signed certification pursuant to SOX by Defendants Utt and Carter, stating that the financial information in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

108.    The statements made by Defendants in ¶¶ 105-07 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the "increase in job income" on projects in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2013, Q2**

109.    On July 25, 2013, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 ("Q2 2013 10-Q").  For the quarter, KBR reported net income of $90 million, or $0.61 per diluted share, on revenue of $2 billion, compared to net income of $104 million, or $0.70 per diluted share, on revenue of $2.06 billion for the same period in the prior year.

110.    The Q2 2013 10-Q stated, in relevant part (emphasis added);

*Foreign Corrupt Practices Act ("FCPA") investigations*

In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division (the "Court"), related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty of $402 million, of which Halliburton was obligated to pay $382 million under the terms of the Master Separation Agreement ("MSA"), while we were obligated to pay $20 million. In addition, we settled a civil enforcement action by the SEC which called for Halliburton and KBR, jointly and severally, to make payments totaling $177 million, which was paid by Halliburton pursuant to the indemnification under the MSA.  We also agreed to a period of organizational probation, during which we retained a monitor who assessed our compliance with the plea agreement and evaluated our FCPA compliance program over a three year period that ended on February 17, 2012. At the end of the three year period the monitor certified that KBR's current anti-corruption compliance program is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws.

In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty of approximately $11 million including interest and reimbursement of certain costs of the investigation, which was paid during the first quarter of 2011. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project. Due to the indemnity from Halliburton under the MSA, we received approximately $6 million from Halliburton in the second quarter of 2011.

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity.  We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working with the ADBG to resolve the issue.  At this time we are still in the process of evaluating the matter and it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investigation.

\*\*\*

*Oil & Gas.*  Oil & Gas revenue and job income decreased by $22 million and $12 million, respectively, in the second quarter of 2013 compared to the same period of the prior year. The decreases in revenue and job income were primarily due to the completion or near-completion of several long term projects including a project in the

North Sea, as well as recognition of approximately $8 million of license fee revenue and income in 2012 for several semi-submersible hulls. *These decreases were partially offset by* new project awards including a FEED project in Iraq, *other long term technical service projects and progress on existing projects including a project in Azerbaijan.*

111.    The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Utt and Carter, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

112.    On March 7, 2013, KBR announced that it was awarded a contract by SOCAR to provide PMC services for the FEED phase of the Gas Processing Plant within the new OGPC in Azerbaijan.  According to KBR, this award was "the first direct engagement between SOCAR and KBR on a large world-scale capital project."  The press release further stated:

> The OGPC will consist of a gas processing plant, currently in FEED phase, with throughput capacity of 10-12 billion cubic meters per annum and a refinery plant with a capacity of 10 million tonnes per annum. Oil products are being developed as strategic domestic assets and the petrochemical plant is being developed mostly for the export market. The GPP FEED completion is expected circa October 2013, with the overall OGPC expected to begin operating in late 2020.

113.    David Zelinski, President of KBR Downstream, stated: "KBR is proud to support SOCAR on their flagship onshore OGPC world-scale facility."  "This award confirms KBR's presence as one of the top engineering contractors in the region, specifically Azerbaijan."

114.    The statements made by Defendants in ¶¶ 109-13 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid

by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; (v) the contract with SOCAR touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR; and (vi) the offset to decreases in revenue resulting from an existing project in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2013, Q3**

115.    On October 24, 2013, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q").  For the quarter, KBR reported net income of $24 million, or $0.16 per diluted share, on revenue of $1.81 billion, compared to a net loss of $81 million, or ($0.55) per diluted share, on revenue of $1.99 billion for the same period in the prior year.

116.    The Q3 2013 10-Q stated, in relevant part (emphasis added):

***Foreign Corrupt Practices Act ("FCPA") investigations***

> In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division (the "Court"), related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty of $402 million, of which Halliburton was obligated to pay $382 million under the terms of the Master Separation Agreement ("MSA"), while we were obligated to pay $20 million. In addition, we settled a civil enforcement action by the SEC which called for Halliburton and KBR, jointly and severally, to make payments totaling $177 million, which was paid by Halliburton pursuant to the indemnification under the MSA. We also agreed to a period of organizational probation, during which we retained a monitor who assessed our compliance with the plea agreement and evaluated our FCPA compliance program over a three year period that ended on February 17, 2012. At the end of the three year period the monitor certified that KBR's current anti-corruption compliance program is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws.

> In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the United Kingdom ("U.K.") Serious Fraud Office ("SFO") in which the SFO accepted

that MWKL was not party to any unlawful conduct and assessed a civil penalty of approximately $11 million including interest and reimbursement of certain costs of the investigation, which was paid during the first quarter of 2011. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project. Due to the indemnity from Halliburton under the MSA, we received approximately $6 million from Halliburton in the second quarter of 2011.

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working with the ADBG to resolve the issue.  At this time we are still in the process of evaluating the matter and it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investigation.

***

Hydrocarbons revenue increased by $53 million in the third quarter of 2013 compared to the same period of the prior year. The increase was primarily due to new ammonia project awards at the end of 2012 and during 2013 for EPC, licensing and proprietary equipment on the Dyno Nobel ammonia plant and other projects in North America. Also *contributing to the increase in revenue was* an increase in ammonia technology licenses revenue on other projects worldwide, including the associated basic engineering scope and proprietary equipment, and *increased activity on existing projects, including an oil and gas project in Azerbaijan.*  These increases were partially offset by a decline in revenue due to the completion or near completion of several long term oil and gas projects including the Quad 204 and Chirag projects.

Hydrocarbons job income decreased by $3 million in the third quarter of 2013 compared to the same period of the prior year. This decrease was due to the completion or near completion of several long term oil and gas projects including Quad 204 and Chirag, as well as a non-recurring item in the third quarter of 2012 which contributed $8 million to job income associated with the completion of an ammonia license and basic engineering contract in Venezuela. *These declines were partially offset by* increases due to a $5 million favorable arbitration award on an Egyptian project completed in a prior year, progress on EPC and ammonia plants in North America which are in the early stages, *as well as progress on projects in Azerbaijan* and Uzbekistan.

117.   The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendant

Utt in his capacity as both CEO and acting CFO, stating that the financial information contained

in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

118.    The statements made by Defendants in ¶¶ 115-17 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; (v) the increase in revenue resulting from increased activity from an oil and gas project in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR; and (vi) the offset to declines in hydrocarbon job income resulting from projects in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2013, Q4 and Annual**

119.    On February 27, 2014, KBR filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").   For the quarter, KBR reported, net income of $27 million, or $0.18 per diluted share, on revenue of $1.72 billion, compared to net income of $30 million, or $0.20 per diluted share, on revenue of $1.83 billion for the same period in the prior year.   For fiscal year 2013, KBR reported net income of $229 million, or $1.54 per diluted share, on revenue of $7.28 billion, compared to net income of $144 million, or $0.97 per diluted share, on revenue of $7.77 billion for fiscal year 2012.

120.     The Company also issued a press release on February 27, 2014 announcing its

fourth quarter and annual 2013 financial results.  The press release stated (emphasis added):

> Net income attributable to KBR was $27 million, or $0.18 per diluted share, compared to net income attributable to KBR of $30 million, or $0.20 per diluted share, in the fourth quarter of 2012.

> Consolidated revenue in the fourth quarter of 2013 was $1.7 billion compared with $1.8 billion in the fourth quarter of 2012.  Gross profit in the fourth quarter of 2013 was $84 million compared to gross profit of $60 million in the prior year fourth quarter.

***

**Hydrocarbons Results**

> Hydrocarbons revenue was $432 million, up $107 million. Hydrocarbons gross profit was $44 million, down $13 million. Fourth quarter 2012 included a $14 million gain related to a project settlement that did not reoccur in 2013. *Revenue growth is the result of* increased downstream activity on ammonia, urea and ethylene projects in North America, an ethylene project in Uzbekistan, and *an oil and gas project in Azerbaijan*.

121.     In the 2013 10-K, the Company stated, in relevant part (emphasis added):

***Foreign Corrupt Practices Act ("FCPA") Investigations***

> In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division (the "Court"), related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty. In addition, we settled a civil enforcement action by the U.S. Securities and Exchange Commission ("SEC"). We also agreed to a period of organizational probation over a three year period that ended on February 17, 2012. The monitor certified that KBR's current anti-corruption compliance program is appropriately designed and implemented to ensure compliance with the FCPA and other applicable anti-corruption laws.

> In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the United Kingdom ("U.K.") Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project.

> On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation

into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the master separation agreement, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity.  We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We have been working with the ADBG to resolve the issue and have now reached an agreement in principle with the ADBG.  The Negotiated Resolution Agreement with the ADBG will likely include a financial assessment equivalent to approximately $6.6 million as well as a three-year debarment from ADBG-sponsored contracts of three Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project. We have accrued the financial penalty in "accounts payable" on our consolidated balance sheets.  There can be no assurances that such an agreement with the ADBG will be reached, and the final terms of the agreement are subject to the negotiation and execution of definitive agreements with the ADBG.

122.    In the 2013 10-K, the Company also stated, in relevant part:

**Compliance**

We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Conducting our business with ethics and integrity is a key priority for KBR. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct.

123.    The Company's Code of Business Conduct, published at all relevant times on KBR's website, addresses KBR's policies regarding bribery and corruption in further detail, as excerpted *supra* at ¶ 101.

124.    The 2013 10-K included an "Overview of Financial Results" and included a discussion that compared 2012 to 2011 (emphasis added).

2012 net income attributable to KBR decreased to $144 million from $480 million in 2011.  This decline in performance was related to the December 2011 decline in government operations in Iraq, project completions or near completions on three significant projects in the Gas Monetization segment, project losses in the IGP and Services business segments, and a $178 million charge in 2012 related to the impairment

of a portion of the goodwill from our acquisition of R&S in 2010. Partially offsetting these items were new awards and increased activity in several market segments.

*\*\**

The Hydrocarbons business segment had a strong year in 2012 with *revenues up slightly* compared to 2011 and gross profit increasing 15% from $161 million to $185 million driven by an increase in the number of long-term technical service and engineering projects, recognition of license fee renewals, *increased progress on existing projects primarily located in* the U.S., the North Sea and *Azerbaijan*, as well as recognition of amounts related to the settlement of the Fina Antwerp Olefins ("FAO") claim.

125.    The 2013 10-K also included "Results of Operations by Business Segment":

Hydrocarbons revenue increased $222 million and gross profit decreased $8 million in 2013 compared to 2012. *The increase in revenue was primarily due to* an increase in large EPC contracts for downstream ammonia, urea and ethylene projects utilizing natural gas feedstock in North America, progress on an ethylene project in Uzbekistan and *a services project in Azerbaijan*.

126.    The 2013 10-K contained signed certifications pursuant to SOX by Defendants Utt and Ferraioli, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

127.    On May 30, 2014, KBR filed Amendment No. 1 to the 2013-10-K.  For the quarter, KBR reported, as amended, net loss of $56 million, or ($0.38) per diluted share, on revenue of $1.68 billion, compared to net income of $30 million, or $0.20 per diluted share, on revenue of $1.87 billion for the same period in the prior year.  For fiscal year 2013, KBR reported net income of $75 million, or $0.50 per diluted share, on revenue of $7.21 billion, compared to net income of $144 million, or $0.97 per diluted share, on revenue of $7.77 billion for fiscal year 2012.

128.    The statements in ¶¶ 119, 121-22, 124-26 were repeated therein and not modified.

129.    The statements made by Defendants in ¶¶ 119-27 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading

36

statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the revenue growth resulting from an oil and gas project in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2014, Q1**

130.    On June 19, 2014, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").  For the quarter, KBR reported a net loss of $43 million, or ($0.29) per diluted share, on revenue of $1.63 billion, compared to net income of $88 million, or $0.59 per diluted share, on revenue of $1.83 billion for the same period in the prior year.

131.    The Q1 2014 10-Q stated, in relevant part:

*Foreign Corrupt Practices Act ("FCPA") Investigations*

    In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division, related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty. In addition, we settled a civil enforcement action by the U.S. Securities and Exchange Commission. We also agreed to a period of probation for a three year period that ended on February 17, 2012, after which the monitor certified that KBR's current anti-corruption compliance program has been appropriately designed and implemented to ensure future compliance with the FCPA and other applicable anti-corruption laws.

    In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project.

37

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million, of which $0.3 million has been paid and the remainder is in progress, having been delayed awaiting approval from the National Bank of Ethiopia. We have also agreed to a three-year debarment from ADBG-sponsored contracts of three inactive Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project.

132.    The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

133.    The statements made by Defendants in ¶¶ 130-32 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; and (iv) profits derived from such contracts were subject to disgorgement.

**Fiscal Year 2014, Q2**

134.    On July 31, 2014, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, KBR reported a net loss of $8 million, or ($0.06) per diluted share, on revenue of $1.71 billion, compared to net income of $90 million, or $0.61 per diluted share, on revenue of $2 billion for the same period in the prior year.

135.    The Q2 2014 10-Q stated, in relevant part:

***Foreign Corrupt Practices Act ("FCPA") Investigations***

In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division, related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty. In addition, we settled a civil enforcement action by the U.S. Securities and Exchange Commission. We also agreed to a period of probation for a three year period that ended on February 17, 2012, after which the monitor certified that KBR's current anti-corruption compliance program has been appropriately designed and implemented to ensure future compliance with the FCPA and other applicable anti-corruption laws.

In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project.

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million of which $0.3 million has been paid and the remainder is in progress, having been delayed awaiting approval from the National Bank of Ethiopia. We have also agreed to a three-year debarment from ADBG-sponsored contracts of three inactive Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project.

136.    The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

137.    The statements made by Defendants in ¶¶ 134-36 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K.

39

bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; and (iv) profits derived from such contracts were subject to disgorgement.

**Fiscal Year 2014, Q3**

138.    On November 4, 2014, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, KBR reported net income of $30 million, or $0.21 per diluted share, on revenue of $1.66 billion, compared to a net loss of $47 million, or ($0.32) per diluted share, on revenue of $1.79 billion for the same period in the prior year.

139.    The Q3 2014 10-Q stated, in relevant part:

*Foreign Corrupt Practices Act ("FCPA") Investigations*

In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA in the United States District Court, Southern District of Texas, Houston Division, related to the Bonny Island investigation. The plea agreement reached with the DOJ resolved all criminal charges in the DOJ's investigation and called for the payment of a criminal penalty. In addition, we settled a civil enforcement action by the SEC. We also agreed to a period of probation for a three year period that ended on February 17, 2012, after which the monitor certified that KBR's current anti-corruption compliance program has been appropriately designed and implemented to ensure future compliance with the FCPA and other applicable anti-corruption laws.

In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office ("SFO") in which the SFO accepted that MWKL was not party to any unlawful conduct and assessed a civil penalty. The settlement terms included a full release of all claims against MWKL, its current and former parent companies, subsidiaries and other related parties including their respective current or former officers, directors and employees with respect to the Bonny Island project.

On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million of which $0.3 million has been paid and the

remainder is in process. We have also agreed to a three-year debarment from ADBG-sponsored contracts of three inactive Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project.

140.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

141.    The statements made by Defendants in ¶¶ 138-40 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; and (iv) profits derived from such contracts were subject to disgorgement.

**Fiscal Year 2014, Q4 and Annual**

142.    On February 27, 2015, KBR filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the quarter, KBR reported, a net loss of $1.24 billion, or ($8.57) per diluted share, on revenue of $1.42 billion, compared to a net loss of $56 million, or ($0.38) per diluted share, on revenue of $1.68 billion for the same period in the prior year.  For fiscal year 2014, KBR reported a net loss of $1.26 billion, or ($8.66) per diluted share, on revenue of $6.37 billion, compared to net income of $75 million, or $0.50 per diluted share, on revenue of $7.21 billion for fiscal year 2013.

143.    In the 2014 10-K, the Company stated, in relevant part:

**Compliance**

Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct.

144.    The Company's Code of Business Conduct, published at all relevant times on KBR's website, addresses KBR's policies regarding bribery and corruption in further detail, as excerpted *supra* at ¶ 101.

145.    With respect to Engineering & Construction, the Company disclosed (emphasis added):

E&C revenue decreased by $372 million, or 8%, to $4.6 billion in 2014 compared to $5.0 billion in 2013. This decrease was primarily due to lower activity on EPC projects in our LNG/GTL markets, as they neared completion in 2014, and reduced construction projects in the U.S. market. *These decreases were partially offset by* increased activity on EPC contracts for downstream projects in North America, increased activity on several Canadian pipe fabrication and module assembly and construction projects, *increased activity on an upstream project in Azerbaijan* and an increase in KBR services on an LNG project joint venture in Australia.

146.    The 2014 10-K contain certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. However, they are not signed.

147.    As a result, on September 18, 2015, KBR filed Amendment No.1 to the 2014 10-K.  The explanatory note states that the amendment was filed for the purposes of including signatures on the certifications for Bradie and Ferraioli which were inadvertently omitted in the original filing.  Other than that, the amendment does not modify or update disclosures in the original filing.

148.    The statements made by Defendants in ¶¶ 142-46 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the "increased activity on an upstream project in Azerbaijan" that partially offset decreases in E&C revenue that was touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2015, Q1**

149.    On March 27, 2015, KBR issued a press release announcing that it signed a joint venture agreement with SOCAR to establish a new engineering and support services company in Azerbaijan.  The information was also disclosed during KBR investor meetings held March 24-26, 2015.  The press release stated: "With support from KBR and SOCAR, the new company will provide design, engineering, technical procurement, construction supervision and project management service for projects across the upstream, midstream and downstream oil and gas

sectors, primarily in the Republic of Azerbaijan…. Additionally, it will train and develop the local workforce and supervise contractors throughout all stages of a project…." The press release further stated:

> "KBR is proud to continue our successful history in Azerbaijan," said Stuart Bradie, KBR President and CEO. "This joint agreement represents KBR's ability to bring consistent and valuable training and educational programs to the region. We look forward to mobilizing our expertise, systems and procedures to support SOCAR's success with these new projects."
>
> "We are confident that this strong JV will help to realise our ambition to create a world class Azerbaijan-based engineering company," added Rovnag Abdullayev, President, SOCAR.
>
> The JV will be located in Baku. Bookings from the JV will be recognized as projects are awarded in the future.

150.   On April 29, 2015, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, KBR reported net income of $44 million, or $0.30 per diluted share, on revenue of $1.44 billion, compared to a net loss of $43 million, or ($0.29) per diluted share, on revenue of $1.63 billion for the same period in the prior year.

151.   The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

152.   During an earnings call on April 29, 2015, Bradie stated:

> We continue to win in strategically important areas, the Yara BASF we announced full EPC in that we also announced the JV with the National Oil Company of Azerbaijan and SOCAR. Strategy around reimbursable construction base them through in the quarter and I guess our positioning in LNG with Dragon LNG EPC and boil-off liquefaction project in the UK was pleasing win in that period.

***

Low cost development in the Middle-East and Caspian are driving onshore upstream opportunities and I think the JV with SOCAR where we've got a strong footprint in country that plays to national content and the local seen positions as well for offshore ground field projects.

153.    The April 29, 2015 and June 1, 2015 investor presentations also stated: "Continued wins in strategically important areas – e.g., … SOCAR JV in Azerbaijan, reimbursable construction project…." "JV with SOCAR – National Oil Company of Azerbaijan also positions us well for offshore brownfield." "Continued success in strategically important areas – … SOCAR JV in Azerbaijan, major reimbursable construction project…."

154.    The Company also issued a press release on April 29, 2015 announcing "strong first quarter 2015 earnings." The Company stated (emphasis added):

> Net income attributable to KBR was $44 million or $0.30 per diluted share ($0.33 per diluted share excluding $5 million in pre-tax U.S. Government legacy legal fees), in the first quarter of 2015 compared to a net loss of $43 million or a net loss of $0.29 per diluted share, in the first quarter of 2014. Consolidated revenue in the first quarter of 2015 was $1.4 billion compared to $1.6 billion in the first quarter of 2014.
>
> ***
>
> [Stuart Bradie, President and Chief Executive Office of KBR stated], "While oil prices remain depressed, KBR's technology and project delivery capability for natural gas derivative products and associated downstream facilities positions us well for project awards during 2015.  We are also in sole source negotiations for two major U.K. Ministry of Defence (MoD) contracts where awards are expected by the end of 2015.  In recent months we have continued to win a number of key contracts that reflect our strategy, including *a new engineering JV with the State Oil Company of Azerbaijan Republic (SOCAR) to establish a new engineering and support services company in Azerbaijan*, the Black Sea LNG FEED award, a major U.S. construction award and pre-FEED work for two world-scale ammonia facilities."

155.    The statements made by Defendants in ¶¶ 149-54 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in

Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the joint venture agreement with SOCAR in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2015, Q2**

156.    On August 4, 2015, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, KBR reported net income of $62 million, or $0.43 per diluted share, on revenue of $1.38 billion, compared to a net loss of $8 million, or ($0.06) per diluted share, on revenue of $1.71 billion for the same period in the prior year.

157.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

158.    On an August 4, 2015 earnings call for the quarter ended June 30, 2015, Bradie stated (emphasis added): "Onshore opportunities in the Middle East and Caspian do remain positive. *We've formed a joined venture in Azerbaijan with SOCAR, the national oil company*. We've been in Azerbaijan for many, many years and been involved in most of the developments, particularly in the offshore side in and around Azerbaijan, so we feel this sort of plays to the national content push and strengthens our position there particularly for brownfield work."

159.    The August 4, 2015 and August 31, 2015 investor presentations, and the September 10, 2015 D.A. Davidson 14th Annual E&C Conference presentation, also stated: "JV

with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield."

160.    The statements made by Defendants in ¶¶ 156-59 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the joint venture agreement with SOCAR in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2015, Q3**

161.    On October 22, 2015, KBR announced its financial and operating results for the quarter ended September 30, 2015 in an earnings call.  Bradie stated: "Good pipeline of near-term and long-term prospects focused on the Middle East as we're identifying a number of opportunities in that market, onshore upstream opportunities in the Middle East and Caspian and our joint venture in Azerbaijan with SOCAR is tendering heavily for some good opportunities in the offshore brownfield arena.  As many of you know, we've been in Azerbaijan for many, many years and have a very good reputation there.  Offshore developments continue, some in the Gulf of Mexico, some in the North Sea, obviously in Azerbaijan as previously mentioned, and some in Thailand, but again, very specific opportunities that we're targeting in those markets."

162.    On November 2, 2015, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, KBR reported net income of $55 million, or $0.38 per diluted share, on revenue of $1.2 billion, compared to net income of $30 million, or $0.21 per diluted share, on revenue of $1.66 billion for the same period in the prior year.

163.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

164.    The November 2, 2015 investor presentation, as well as the November/December 2015 Investor Overview Presentation, stated: "JV with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield."

165.    The statements made by Defendants in ¶¶ 161-64 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) the joint venture agreement with SOCAR in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2015, Q4 and Annual**

166.    On February 26, 2016, KBR filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, KBR reported net income of $42 million, or $0.29 per diluted share, on revenue of $1.08 billion, compared to a net loss of $1.24 billion, or ($8.57) per diluted share, on revenue of $1.41 billion for the same period in the prior year.  For fiscal year 2015, KBR reported net income of $203 million, or $1.40 per diluted share, on revenue of $5.09 billion, compared to a net loss of $1.26 billion, or ($8.66) per diluted share, on revenue of $6.36 billion for fiscal year 2014.

167.    In the 2015 10-K, the Company stated, in relevant part:

**Compliance**

Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct.

168.    The Company's Code of Business Conduct, published at all relevant times on KBR's website, addresses KBR's policies regarding bribery and corruption in further detail, as excerpted *supra* at ¶ 101.

169.    With respect to Engineering & Construction, the Company disclosed (emphasis added):

E&C revenue decreased by $372 million, or 8%, to $4.6 billion in 2014 compared to $5.0 billion in 2013. This decrease was primarily due to lower activity on EPC projects in our

LNG/GTL markets, as they neared completion in 2014, and reduced construction projects in the U.S. market. *These decreases were partially offset by* increased activity on EPC contracts for downstream projects in North America, increased activity on several Canadian pipe fabrication and module assembly and construction projects, *increased activity on an upstream project in Azerbaijan* and an increase in KBR services on an LNG project joint venture in Australia.

170.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

171.    On March 8, 2016, KBR announced that its joint venture with SOCAR was awarded a significant PMC for the Heydar Aliyev Baku oil refinery modernization project in Azerbaijan.  KBR's press release stated: "This award marks the first major award to the joint venture, SOCAR-KBR Limited Liability Company (SOCAR-KBR LLC), since its inception in mid-2015."  The press release further stated:

> Addressing the contract signing ceremony, Rovnag Abdullayev, SOCAR's President, said, "The Heydar Aliyev refinery reconstruction project is currently one of the most important investments for SOCAR globally, and I am very happy that this project is in the capable hands of one of SOCAR's own entities—namely the SOCAR-KBR joint venture."

> The overall refinery capacity will be increased from 6 to 7.5 million tons per year (MYPY).  The catalytic cracking unit capacity will be increased from 2 to 2.5 MTPY, and Euro 5 standards will be established for all refined products.  The modernization of the Heydar Aliyev Baku oil refinery will begin immediately and will be completed by late 2018, with an estimated capital cost of $1 billion USD for the total project.

> "KBR is proud to support our long term partner SOCAR on this project.  It is very significant that SOCAR-KBR LLC, as an Azerbaijani Company, takes on the PMC role for this key project for Azerbaijan," said Jan Egil Braendeland, President, KBR EEA and SOCAR-KBR LLC Board Member.  "KBR has worked on various projects in Azerbaijan since 1994, achieving more than 17 million man-hours.  At peak times, KBR employed nearly 400 Azerbaijani workers—expending more than 4 million man-hours in country. We are very proud of our track record to the Azeri economy," continued Braendeland.

The value of the PMC contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in Q1 of 2016.

172.    The statements made by Defendants in ¶¶ 166-71 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; (v) the "increased activity on an upstream project in Azerbaijan" touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR; and (vi) the PMC contract for the Heydar Aliyev Baku oil refinery awarded to KBR's joint venture with SOCAR touted by the Company was the result of the illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2016, Q1**

173.    On April 29, 2016, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").   For the quarter, KBR reported net income of $42 million, or $0.30 per diluted share, on revenue of $996 million, compared to net income of $44 million, or $0.30 per diluted share, on revenue of $1.43 billion for the same period in the prior year.

174.    The Q1 2016 10-Q stated, in relevant part: "there have been news reports related to Unaoil … and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR.   It has also been reported that the U.S. DOJ is conducting an investigation of Unaoil related to the information reported in these news

51

articles.   The DOJ contacted the Company in connection with that investigation and the Company is cooperating with its requests for information."

175.   The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

176.   Also on April 29, 2016, KBR held its earnings call announcing its Q1 2016 financial and operating results.  Bradie stated, in relevant part:

> It's also been reported that the U.S. Department of Justice has conducted an investigation of Unaoil related to information reported in these news articles.  It is our understanding that, in connection with the investigation, the DOJ has contacted several companies, including KBR and we're, of course, responding to the DOJ's request for information.  I'd like to reiterate that KBR is committed to conducting its business honestly, with integrity and in compliance with all applicable laws.  We certainly do not tolerate illegal or unethical practices by our employees or others working on behalf of the Company.

177.   The statements made by Defendants in ¶¶ 173-76 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) despite stating that the Company was "committed to conducting it business honestly" with respect to the DOJ investigation, KBR knowingly engaged in bribery in order to win contracts in Kazakhstan and Azerbaijan.

**Fiscal Year 2016, Q2**

178.    On July 29, 2016, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, KBR reported net income of $47 million, or $0.32 per diluted share, on revenue of $1 billion, compared to net income of $62 million, or $0.43 per diluted share, on revenue of $1.38 billion for the same period in the prior year.

179.    The Q2 2016 10-Q stated, in relevant part: "The U.S. DOJ and the SEC are conducting investigations of news reports related to Unaoil … and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR. We have been, and intend to continue, cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

180.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

181.    The statements made by Defendants in ¶¶ 178-80 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid

by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; and (iv) profits derived from such contracts were subject to disgorgement.

**Fiscal Year 2016, Q3**

182.    On November 1, 2016, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, KBR reported a net loss of $63 million, or ($0.44) per diluted share, on revenue of $1.07 billion, compared to net income of $55 million, or $0.38 per diluted share, on revenue of $1.19 billion for the same period in the prior year.

183.    The Q3 2016 10-Q stated, in relevant part (emphasis added): "The U.S. DOJ and the SEC are conducting investigations of activities Unaoil … may have engaged in related to international projects involving several global companies, *as well as KBR's interactions with Unaoil*.  KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

184.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

185.    On November 7, 2016, KBR announced that its joint venture with SOCAR was awarded a second PMC contract for the Azerikimya Production Union of the State Oil Company of Azerbaijan.  KBR stated:

> Addressing the audience at the contract signing ceremony, Rovnag Abdullayev, SOCAR's President, said, "The modernization project will make it possible to increase the production facilities at Azerikimya, ensure the supply of raw materials to polyethylene and polypropylene production installations and to meet the demand in the

country. It will also increase the country's export potential, enhance the security of the technological process and the quality of raw materials and finished products.

"SOCAR-KBR LLC, combines KBR's extensive experience in the oil and gas sector with SOCAR's strong vision and leadership in the region to perform the program management role for this key project for Azerikimya," said Jan Egil Braendeland, SOCAR KBR LLC Board Member and KBR Executive Vice President of Global Sales. "We have passionate and talented Azerbaijani and international team members who are dedicated to Azerbaijan and our partner SOCAR and I am confident SOCAR KBR LLC will deliver successfully on this project and others in region," Braendeland continued.

The value of the contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in Q4 of 2016.

186.    The statements made by Defendants in ¶¶ 182-85 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; (v) the increased activity in Azerbaijan touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR; and (vi) the second PMC contract for the Azerikimya Production Union of the State Oil Company of Azerbaijan awarded to the SOCAR KBR LLC joint venture touted by the Company was the result of illicit bribes arranged by Unaoil on behalf of KBR.

**Fiscal Year 2016, Q4 and Annual**

187.    On February 24, 2017, KBR filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K").    For the quarter, KBR reported a net loss of $87 million,

or ($0.61) per diluted share, on revenue of $1.19 billion, compared to net income of $42 million, or $0.29 per diluted share, on revenue of $1.08 billion, for the same period in the prior year.  For fiscal year 2016, KBR reported a net loss of $61 million, or ($0.43) per diluted share, on revenue of $4.26 billion, compared to net income of $203 million, or $1.40 per diluted share, on revenue of $5.09 billion for fiscal year 2015.

188.   The 2016 10-K repeated what the Company stated on November 1, 2016 in the Q3 2016 10-Q regarding the investigations (emphasis added): "The U.S. DOJ and the SEC are conducting investigations of activities Unaoil … may have engaged in related to international projects involving several global companies, *as well as KBR's interactions with Unaoil*.  KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

189.   In the 2016 10-K, the Company also stated, in relevant part:

**Compliance**

Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding our Code of Business Conduct and other specific areas including anti-bribery compliance and international trade compliance.

190.   The Company's Code of Business Conduct, published at all relevant times on KBR's website, addresses KBR's policies regarding bribery and corruption in further detail, as excerpted *supra* at ¶ 101.

191.    The 2016 10-K contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

192.    The statements made by Defendants in ¶¶ 187-91 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; and (iv) profits derived from such contracts were subject to disgorgement.

**Fiscal Year 2017, Q1**

193.    KBR announced on March 1, 2017 that it was awarded a two-year engineering services call off-contract by the North Caspian Operating Company ("NCOC") for its projects in the Kazakhstan zone of the Caspian Sea.

194.    Under the North Caspian Sea Production Sharing Agreement ("NCSPSA"), NCOC acts on behalf of a consortium of seven energy companies comprised of KazMunayGas, Eni, Shell, ExxonMobil, Total, CNCP and INPEX, to operate oil and gas activities within the offshore oil field developments covered under the NCSPSA including the Kashagan, Akote, Kairan and Kalamkas fields.

195.    Jay Ibrahim, KBR's President for Europe, Middle East and Africa, stated: "KBR is pleased to have the opportunity to provide our renowned front-end expertise, and engineering

and execution excellence, for these significant projects for NCOC."   "This award continues KBR's long time work in the Caspian region and our enduring relationship with the operators on these off-shore developments to deliver economic and innovative solutions to further the development of these challenging projects…."

196.   On April 28, 2017, KBR filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, KBR reported net income of $37 million, or $0.26 per diluted share, on revenue of $1.10 billion, compared to net income of $42 million, or $0.30 per diluted share, on revenue of $996 million for the same period in the prior year.

197.   The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Sopp, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

198.   The statements referenced in ¶¶ 193-97 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company and its U.K. Subsidiaries violated U.K. bribery and corruption laws because the Company's agent, Unaoil, bribed corrupt officials in Kazakhstan and Azerbaijan in order to win contracts on KBR's behalf; (ii) the commissions paid by KBR to Unaoil were used to effectuate such bribes; (iii) KBR earned revenue and profits from such contracts; (iv) profits derived from such contracts were subject to disgorgement; and (v) far from reflecting the Company's

"enduring relationship" with Kazakhstan, the contract in the Caspian Sea was awarded to KBR as a result of its payment of bribes to government officials through Unaoil.

## The Truth Emerges

199.     On July 29, 2016, KBR filed its Q2 2016 10-Q.  The report stated: "The U.S. DOJ and the SEC are conducting investigations of news reports related to Unaoil … and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR.  We have been, and intend to continue, cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

200.     On this news, KBR's share price fell $0.60, or 4.1%, to close at $14.02 on July 29, 2016.

201.     On November 1, 2016, KBR filed its Q3 2016 10-Q.  The Q3 2016 10-Q stated (emphasis added): "The U.S. DOJ and the SEC are conducting investigations of activities Unaoil … may have engaged in related to international projects involving several global companies, *as well as KBR's interactions with Unaoil*.  KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena."

202.     On this news, KBR's share price fell $0.24, or approximately 2%, to close at $14.57 on November 1, 2016.

203.     On January 17, 2017, Rolls-Royce admitted to paying Unaoil to bribe people on its behalf to secure contracts in Azerbaijan, Kazakhstan, Iraq, Angola and elsewhere, pursuant to a deal with U.S. and British authorities.  The company will pay $800 million in connection with the bribery scandal.  Of the $800 million settlement, Rolls-Royce will pay about $170 million to

the U.S. Treasury, about $600 million to the SFO, and $25 million to the Brazilian Ministério Publico Federal.

204.     On this news, KBR's share price fell $0.18, or 1%, to close at $16.66 on January 18, 2017.

205.     On April 28, 2017, the SFO confirmed that it had opened an investigation into "the activities of KBR's UK subsidiaries, their officers, employees and agents for suspected offences of bribery and corruption…   The investigation is related to the SFO's ongoing investigation into the activities of Unaoil."

206.     Additionally, on April 28, 2017, KBR filed its Q1 2017 10-Q.  The report stated (emphasis added):

> The DOJ, SEC, and the SFO are conducting investigations of Unaoil … in relation to international projects involving several global companies, including KBR, whose interactions with Unaoil are a subject of those investigations.  KBR is cooperating with the DOJ, SEC, and the SFO in their investigations, which includes the voluntary submission of information and compliance with formal document requests, including a subpoena from the SEC and a Section 2 notice from the SFO.
>
> ***
>
> As has been reported previously, following our 2009 guilty plea and settlement with the DOJ and SEC over the legacy TSKJ [Nigerian] matter[,] KBR was under a DOJ-approved monitorship during which our compliance program was significantly enhanced and now is extremely robust. We conducted a thorough review of all international business relationships at the time of the monitorship *and only continued with those parties, including Unaoil*, that passed our rigorous review and agreed to adhere to all applicable anti-corruption laws.

207.     On this news, KBR's share price fell $1.43, or 9.24%, to close at $14.05 on April 28, 2017.

208.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

60

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

209.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired KBR securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, KBR securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by KBR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

213.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of KBR;

- whether the Individual Defendants caused KBR to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of KBR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

215.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- KBR securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold KBR securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

216. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

217. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

218. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

219. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

220. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the

other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of KBR securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire KBR securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

221.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for KBR securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about KBR's finances and business prospects.

222.    By virtue of their positions at KBR, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and

omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

223.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of KBR securities from their personal portfolios.

224.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As officers and/or directors of KBR, the Individual Defendants had knowledge of the details of KBR's internal affairs.

225.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of KBR.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to KBR's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of KBR securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning KBR's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired KBR securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

226.    During the Class Period, KBR securities were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of KBR securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of KBR securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.   The market price of KBR securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

227.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

228.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

229.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

230.     During the Class Period, the Individual Defendants participated in the operation and management of KBR, and conducted and participated, directly and indirectly, in the conduct of KBR's business affairs.  Because of their senior positions, they knew the adverse non-public information about KBR's false statements.

231.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KBR's financial condition and results of operations, and to correct promptly any public statements issued by KBR which had become materially false or misleading.

232.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which KBR disseminated in the marketplace during the Class Period concerning KBR's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause KBR to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of KBR within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of KBR securities.

233.     Each of the Individual Defendants, therefore, acted as a controlling person of KBR.  By reason of their senior management positions and/or being directors of KBR, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, KBR to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of KBR and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

67

234.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KBR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 20, 2017

Respectfully submitted,

*/s/ Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
The Briscoe Law Firm, PLLC
3131 McKinney Avenue, Suite 600
Dallas, Texas 752014
Telephone: (214) 643-6011
Facsimile: (281) 254-7789
Email:  wbriscoe@thebriscoelawfirm.com

68

**POMERANTZ LLP**

Jeremy A. Lieberman
Brenda Szydlo
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email:  jalieberman@pomlaw.com
        bszydlo@pomlaw.com
        mgorrie@pomlaw.com


**POMERANTZ LLP**

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiffs and the
Proposed Class*